In re A.H. ROBINS COMPANY, INCORPORATED, Debtor, Employer's Tax Identification No. 54–0486348.

Glenna F. KIDD, Movant,

v.

DALKON SHIELD CLAIMANTS TRUST, Respondent.

No. 85–01307–R.

United States District Court,
E.D. Virginia,
Richmond Division.

Dec. 7, 1994.

Glenna Kidd, Shelbyville, Tennessee, pro se.

Orran Lee Brown, Richmond, Virginia, for Dalkon Shield Claimants Trust.

### MEMORANDUM

MERHIGE, District Judge, and BLACKWELL N. SHELLEY, Bankruptcy Judge.

This matter, arising from Dalkon Shield Claimant Glenna F. Kidd's motion to show cause, was heard by the Court on November 22, 1994. For the reasons which follow, the Court will treat Kidd's motion as a motion to reinstate a disallowed claim and will deny her any relief.

### I.

Kidd initially submitted her Option 3 claim form in March, 1990. After reviewing her claim, the Trust extended a nominal close out offer in October, 1991. The offer reflected the Trust's finding that Kidd's medical records failed to show that her injury was caused by the Dalkon Shield. Kidd subsequently requested re-review, proffering additional evidence. Because some of this material qualified as newly discovered evidence, Kidd's claim was re-reviewed. After re-evaluating her claim, the Trust concluded that Kidd had again failed to establish causation and, in May, 1992, extended a re-review offer equal to the original offer.

Kidd rejected this offer and elected to proceed through the in-depth review/settlement phase of the claims resolution process. *See* Claims Resolution Facility ("CRF")

§ E.4. At the time she rejected her offer, Kidd made a "counter offer" to the Trust in the amount of $5,000,000.00. Kidd demanded that the Trust respond to the counter offer within fifteen days. Kidd wrote that failure to respond would be deemed a waiver of the settlement conference and certification process by the Trust and that she would then proceed directly to litigation or arbitration. *See* Petitioner's Motion to Show Cause, May 18, 1992 Letter from Petitioner to Trust. The Trust ignored this ultimatum.

In preparing for Kidd's settlement conference, the Trust noticed several discrepancies between the original medical records and copies of the same submitted by Kidd for purposes of the conference. The documents sent to the Trust by Kidd include (1) a copy of a letter from Dr. John G. Young, a gynecologist, dated November 7, 1991, (2) a copy of a Medical Records Request Form ("Request Form") allegedly signed by Dr. Young and (3) copies of hospital records. Each of these documents bears alterations. To begin, the hospital records submitted by Kidd bear handwritten notations concerning endometriosis and injury causation. Copies of the original records obtained by the Trust are void of any such notations. *Compare* Trust Trial Exh. 5 at 4 *with* Exh. 6 at 17. Thus, the Trust concluded that someone other than authorized hospital personnel improperly added information to the hospital records that Kidd submitted in support of her claim. At the hearing, Kidd admitted that she was responsible for the handwritten additions to the hospital records. She testified, however, that the notations were made in an effort to understand and translate the medical terminology employed in the records, not to mislead the Trust in the evaluation of her claim.

In the November, 1991 letter, two medical entry dates have been changed, the changes supposedly initialed by Dr. Young. *See* Trust Trial Exh. 4 at 4. In addition, the words "and Pelvic Inflammatory Desease [sic]" have been typed over what appears to be whited-out print in the October 16, 1978 entry. *Id.* Finally, on page two of the Request Form there appears the following language: "At the time of the historectomy [sic],

the infection was so bad it was visible to the eye. And surely due to Dalkon/s." *See* Trust Trial Exh. 1.

The Trust contacted Dr. Young in March, 1993, in an effort to determine the source of these alterations and additions. Dr. Young responded to the Trust's inquiry by means of a March 24, 1993, letter and enclosed therewith a purported original copy of his November, 1991 letter. In this correspondence, Young stated that: (1) he neither changed, nor initialed any changes to, the entry dates in the November, 1991 letter; (2) he did not white-out any language in the November, 1991 letter and replace it with words regarding pelvic inflammatory disease; (3) the Request Form was not sent to the Trust from his office; (4) he was not responsible for adding to the Request Form language regarding injury visibility and causation; (5) it was not his signature appearing on the Request Form. Trust Trial Exh. 4 at 1. Dr. Young also noted that "this information was sent to [the Trust] by someone other than from this office. This is my first correspondence directly with [the Trust.]" *Id.* In a post script, Dr. Young added the following: "I would like to add that there is no way that I could say that Mrs. Kidd's infection was due to the Dalkon Shield." *Id.*

As a consequence of these events, Kidd's claim was placed on administrative hold while the claim was referred to the United States Postal Inspector. After referral of Kidd's claim, however, this Court issued its opinion in *Besag v. Dalkon Shield Claimants Trust,* 197 B.R. 590 (E.D.Va. 1994),[1] and the Trust, in response to the Court's *Besag* Order, placed a sixty-day limit on the administrative hold. During this period, the Trust itself, in situations involving potentially deceptive claims, further investigates any potential wrongdoing by a claimant. If the Trust makes a finding of wrongdoing, the claim is disallowed within the meaning of Plan section 1.48 and is forever barred from recovery unless reinstated by the Court. *See* Claimants Trust Agreement § 5.02(b). Kidd's claim fell within this new policy adopted by

the Trust and, on November 1, 1994, was disallowed as bearing indicia of wrongdoing. *See* Report on Disallowance of Claims on Administrative Hold, Docket No. 20290 (November 1, 1994).

In the meantime, Kidd filed a Motion to Show Cause on July 27, 1993, pursuant to which Kidd moves the Court to "summon the defendant to show cause why they have not obeyed the Court's order to pay damages to the plaintiff." The motion is premised upon the allegedly improper processing of her claim. Specifically, she contests the length of the review process and the Trust's failure to pay her claim. As part of her motion, Kidd submitted a "Personal Injury Suit" against A.H. Robins *and* the Trust outlining the $5,000,000.00 in damages being sought.

The evidence produced at the hearing elucidates some of these facts. Kidd, for example, testified that she was responsible for adding to the Request Form the typewritten note reading: "At the time of the historectomy [sic], the infection was so bad it was visible to the eye. And surely due to Dalkon/s." Kidd asserted that she made this alteration so that the Request Form reflected *her* interpretation of medical records maintained by Young and several alleged conversations with Young. *See* Petitioner's Exh. 1. In a previously tape recorded telephone conversation with Young, introduced by Kidd without objection, Kidd again admitted to making this notation:

> MRS. KIDD: Now, see, I had typed that in, but you signed that. You know, because I brought these papers in. That was the first thing you ever signed.
>
> DR. YOUNG: Well, I would never have signed one that said that this was due to the Shield, because there is no possible way I could tell that it was due to the Shield.

Transcript of Taped Conversation at 3–4. During this conversation, Kidd repeatedly suggested that Young had, in fact, signed the Request Form bearing the statements re-

---

1. In *Besag,* the Court expressed concern that a claimant could be placed on hold indefinitely pending the outcome of the Postal Service investigation; thus, the Court ordered the Trust to either cancel or modify the administrative hold. 197 B.R. at 596–97. The Court also approved the disallowance of claims suspected of fraud. *Id.* at 597.

garding injury visibility and causation. Young, as he had in his March 24, 1993 letter to the Trust, disagreed:

> MRS. KIDD: Do what, now? All of these signatures were yours.
>
> DR. YOUNG: No this one definitely is a forgery on one of the things. One that said that the infection was surely due to the Dalkon Shield. And I—
>
> MRS. KIDD: That—Dr. Young.
>
> DR. YOUNG: And I have a note saying it was possible that it was that, but I had no way of knowing positive what caused the infection.
>
> \*    \*    \*    \*    \*    \*
>
> DR. YOUNG: And there is no way that I signed anything that said that there was no question [that] it was related to the I.U.D., because there is no earthly way that would have been possible.
>
> MRS. KIDD: Well, that was—see, that paper was typed up, I thought you read it. I sure thought you read it. But you are sure—but you sure signed it.
>
> DR. YOUNG: Well, [the Trust] highlighted the whole thing.
>
> \*    \*    \*    \*    \*    \*
>
> DR. YOUNG: A signature highlighted that did not match the previous signature on the thing here. And—

Transcript of Taped Conversation at 2, 5–6. Thus, not only did Young deny signing the Request Form, but he adamantly maintained that there was no way that he could conclude that Kidd's injuries were "surely" attributable to the Dalkon Shield. Rather, Young only restated the conclusion of a handwritten notation in his November 7, 1991 letter and the postscript to the March 24, 1993 letter to

the effect that Kidd's injuries "could" have been caused by the Dalkon Shield.[2]

## II.

■ Kidd's show cause motion in no way warrants relief from this Court. Any claims against Robins are indisputably improper given the release and discharge provisions of Plan sections 8.01 and 8.03 and paragraphs 29 and 33 of the Plan Confirmation Order. Likewise, actions against the Trust are enjoined until all claims resolution procedural prerequisites are satisfied. *See* Plan § 8.04 (injunction); Confirmation Order at ¶ 34 (same). As set forth above, Kidd has not proceeded properly through the claims resolution process; consequently, she may not seek relief from the mandatory procedures set forth in the CRF. Finally, Kidd's challenge to the handling of her claim amounts to nothing more than a largely unsubstantiated assault on day-to-day Trust operations. This Court has repeatedly held that unless the claimant provides facts elevating the matter above the level of ordinary operations, relief will not be granted. *Mantush v. Dalkon Shield Claimants Trust,* 197 B.R. 493 (E.D.Va.1994); *accord Shukis v. Dalkon Shield Claimants Trust,* 175 B.R. 204 (Bkrtcy.E.D.Va.1994); *see* Plan § 8.05. Kidd has failed to satisfy this standard as the record reveals that her claim was placed on administrative hold for an apparently legitimate reason and that the Trust, in response to *Besag,* took appropriate action in disallowing the claim. Accordingly, the motion to show cause must be denied.[3]

■ At this point, the Court *could* dispose of this matter by denying Kidd's motion. The onus would then fall on Kidd to move formally for reinstatement if she wanted to pursue her claim any further. *See supra*

---

2. The evidence produced at the hearing failed to address adequately the changes to Young's November 7, 1991 letter. Kidd testified that Young's wife typed, on the office typewriter, the language regarding pelvic inflammatory disease and that Young initialed the date changes. No evidence contradicting Kidd's explanation was offered at the hearing; thus, the only evidence rebutting this explanation is the March, 1993 letter from Young to the Trust. *See supra* at 599–600 (outlining content of Young's letter).

3. If the Court decided to end its consideration of the matter at this point, Kidd would not be foreclosed from taking further action on her claim. In *Besag* the Court explicitly left open an avenue of appeal to claimants whose claims have been disallowed on the basis of fraud; thus, Kidd would have been able to file a formal motion requesting that the Court reinstate her claim. *See* 197 B.R. at 597. The Court has retained the exclusive jurisdiction to consider such motions. *See* Plan § 8.05(c); Amended Administrative Order No. 1, July 1, 1991, at ¶ 3.a.

note 3. Given Kidd's *pro se* status and her perseverance in seeking compensation for her claim, however, the Court, in the name of expediency, efficiency and fairness, will treat her motion to show cause as a motion to reinstate her claim and proceed accordingly.

### III.

Judicial review of motions to reinstate claims disallowed on the basis of wrongdoing is a matter of first impression before this Court.[4] Unlike other cases in which the Court has considered claim disallowance, cases falling into this new disallowance category cannot be analyzed under the Rule 60(b) rubric as the claimants are not appealing from a final judgment (i.e., a deadline affirmed by the Court).[5] Rather, they are challenging the *Trust's* discretionary disallowance of their claim. In this regard, the Court has provided an "avenue of appeal" for claimants whose claims are disallowed by the Trust on grounds of potential wrongdoing. *Besag*, 197 B.R. at 597. The Court did not, however, enunciate the applicable standard of proof or assign the burden of proof when such matters are appealed.

■ The standard of proof issue is easier to resolve. Given that these proceedings sound in tort, the standard of proof generally applied in tort cases will be applied to motions to reinstate claims disallowed for potential wrongdoing. Thus, the party bearing the burden of proof must establish his or her position by a preponderance of the evidence.[6] In other words, depending on who bears the burden, a party must show a claim is more likely fraudulent than genuine, or, alternatively, that a claim is more likely genuine than fraudulent.

■ Assigning the burden of proof is somewhat more complicated. The question presented is whether (a) the Trust bears the burden of substantiating its disallowance and proving that the claim is more likely fraudulent than genuine, or (b) the Claimant bears the burden of proving that his or her claim is more likely genuine than fraudulent.[7] Under option (a) the Trust must explain the disallowance and convince the Court by a preponderance of the evidence that the claim is, in fact, fraudulent. Essentially, the Trust would proffer the same evidence it used in disallowing the claim and the Court would decide, after considering this evidence and any rebuttal evidence, whether the Trust has proven that the claim is more likely fraudulent. This option obviously weighs in favor of claimants and is arguably the more equitable choice when claimants, such as Kidd, are proceeding *pro se.* Moreover, this option would probably not be any more expensive or time consuming for the Trust than an alternative burden of proof rule because the Trust usually possesses, through the internal fraud investigation, the evidence with which it will develop its case.

If option (b) is selected, the Court, in effect, is acknowledging that the Trust sets forth a *prima facie* case of wrongdoing by exercising its discretionary disallowance power. Thus, where a claim has been disallowed based on administrative findings of documentary alterations, the burden would fall on the claimant to prove that the claim should be reinstated. This option may be analogized to motions under section 502 of the Bankruptcy Code which permits claims disallowed in bankruptcy to be reconsidered "for cause."

---

**4.** This Court has the exclusive jurisdiction to determine whether or not "a Disallowed Claim should be reinstated." *See* Plan § 8.05(c), March 28, 1988, *confirmed by In re A.H. Robins Co.*, 88 B.R. 742 (E.D.Va.1988), *aff'd* 880 F.2d 694 (4th Cir.1989), *cert. denied* 493 U.S. 959, 110 S.Ct. 376, 107 L.Ed.2d 362 (1989); *see also In re A.H. Robins Co., Inc.*, 972 F.2d 77 n. 1 (4th Cir.1992) (affirming the Court's exclusive jurisdiction).

**5.** *See e.g., In re A.H. Robins Co., Inc. (Gorka)*, Docket No. 15781 (September 29, 1993) (claimant seeking relief from Court's order disallowing her claim for failure to meet a deadline).

**6.** The "preponderance of the evidence" standard also applies when one attempts to validate a challenged claim in bankruptcy. *See* Norton Bankruptcy Law and Practice 2d § 41:7 (1994).

**7.** The Trust favors, as one might expect, option (b). "Since the Trust has in its discretion determined that the claim is so lacking credibility that it should be disallowed, the burden is on the claimant in appealing that determination to prove to this Court that her claim is genuine." Response at 10.

*See* 11 U.S.C. § 502(j).[8] Section 502(j) has been interpreted, in conjunction with Federal Rule of Civil Procedure 60(b), as placing the burden of establishing "cause" on the moving party. *In re Rankin*, 141 B.R. 315 (W.D.Tex.1992) ("party seeking reconsideration ... should explicitly or implicitly assert one of the grounds delineated in Rule 60(b)"); *Shaw v. Easter*, 25 B.R. 418 (S.D.Ohio 1982) ("the movant for reconsideration ... bears a burden similar to a party seeking a reconsideration of a final order ... under Rule 60(b)"); *see* Norton Bankruptcy Law and Practice 2d § 41:15 (1994). Likewise, in the Dalkon Shield Context, a claimant seeking reinstatement of his or her claim could be compelled to bring forth evidence substantiating the alleged validity of a claim that has been disallowed by the Trust. This option, while burdensome on the claimant, would be consistent with other Trust procedures and Court holdings that place the burden of proof on claimants in various contexts.[9] Finally, the option may serve the additional purpose of deterring claimants from seeking reinstatement of plainly fraudulent claims.

■ While both options have strengths and weaknesses, the Court, after careful consideration, holds that where a claimant seeks to reinstate a claim disallowed for potential wrongdoing, the claimant bears the burden of proving by a preponderance of the evidence that his or her claim should be reinstated. A claimant satisfies this burden by proffering sufficient evidence to prove that it is more likely than not that the claim and any evidence submitted in support thereof are genuine, and that the Trust therefore

erred in disallowing the claim. The requisite evidentiary showing will undoubtedly differ depending on the basis of the Trust's disallowance. For example, a claim disallowed on a Trust finding that the claimant does not exist could be reinstated upon a sufficient showing that the claimant is, in fact, a real person and either used, or is related to one who used, a Dalkon Shield. On the other hand, where a claim, such as Kidd's, is disallowed on the basis of allegedly unauthorized and misleading documentary alterations, additions or deletions, the claimant must show by a preponderance of the evidence that the altered document accurately depicts the actual diagnoses or conclusions contained in the original, unaltered document. The objective of such a rule is to reduce the risk that the Trust could be misled in its evaluation of the claim.

■ This holding, as noted above, is consistent with burden of proof rules in other Trust contexts as well as the analogous bankruptcy claim reinstatement scenario. Moreover, placing the burden on the claimant would preclude any results inconsistent with prior Court rulings. As stated previously, claims disallowance is a day-to-day operational matter, a matter with which the Court will not interfere absent exceptional circumstances. Indeed, the Court explicitly acknowledged the Trust's ability to disallow claims bearing indicia of wrongdoing in *Besag.* 197 B.R. at 597. Placing the burden on the Trust to show that claims are more likely fraudulent, after the Trust has already examined and disallowed the claim on that exact basis, could justifiably be interpreted as rou-

8. Section 502 only presents an *analogy* to the instant matter because a movant under this section, like a movant under Federal Rule of Civil Procedure 60(b), is appealing from the bankruptcy court's order of disallowance. In the instant matter, there has been no Court Order of disallowance.

9. For example, under Option 3 of the claims resolution process, the claimant must support his or her claim with medical evidence and, upon electing ADR, arbitration or trial, bear the burden of proving causation. *See* CRF §§ E.4 & G.13. A further *example is presented* when a claimant files a motion to interpret the Plan and the motion implicates day-to-day operational de-

cisions of the Trust. In that context, the Court has held repeatedly that the claimant bears the burden of bringing forth "facts or issues that elevate the matter above the level of ordinary operations." *Mantush*, 197 B.R. 493 (E.D.Va. 1994); *accord Shukis*, 175 B.R. 204 (Bkrtcy. E.D.Va.1994); *Gunnell v. Dalkon Shield Claimants Trust*, 197 B.R. 533 (E.D.Va.1994); *Almalich v. Dalkon Shield Claimants Trust*, 197 B.R. 485 (E.D.Va.1994). Finally, claimants who challenge Trust policies bear the burden of "showing that the ... policy fails to fully, fairly, and expeditiously serve individual claimants as well as the group of all claimants" or "that the policy violates some other provision in a Trust instrument." *Besag*, 197 B.R. at 596–97.

tine, unwarranted and inconsistent judicial scrutiny of, and inquiry into, prior operational decisions of the Trust. Placing the burden of proof on the claimant would preempt potential interpretive inconsistencies as the Court, in effect, is implicitly honoring the operational decisions of the Trust. At the same time claimants are protected by means of the *Besag* automatic right of appeal, but, as set forth above, will bear the burden in any such appeal.

## IV.

■ Applying these principles to Kidd's claim, the Court concludes that Kidd has failed to offer evidence sufficient to satisfy her burden of proof.[10] Some of the changes, such as the alteration of the dates on the November, 1991 letter, are relatively innocuous. Other modifications, however, provide a solid basis for the Court to deny Kidd any relief. For example, there remains a question as to the validity of Young's signature on the Request Form. On this issue, Young has consistently maintained that the signature is a forgery. Kidd, on the other hand, testified that she witnessed Young sign three copies of the document. She further maintained that these copies contained her alterations when Young signed them and that Young retained one of the signed copies.

The Court declines to make a finding as to the validity of the Request Form signature because resolution of the instant matter is not dependent upon the legitimacy of such signature. In fact, even if the Court concluded that the signature on the Request Form *was* Dr. Young's, there is ample evidence to deny reinstatement of Kidd's claim. To begin, despite Kidd's purported explanations, the language regarding causation, which Kidd *admittedly* made both to the Request Form and the hospital records, drastically distorts Dr. Young's actual medical conclusions. Such alterations undoubtedly could have misled the Trust in evaluating her claim as the difference between an injury that was "surely" caused by the Dalkon Shield and one which merely "could" have been caused

by the Dalkon Shield can often be the dispositive factor in deciding whether a claimant receives a substantial offer or a nominal offer. Exacerbating these admitted manipulations is Kidd's testimony that she was selective in choosing the medical information that she sent to the Trust. Kidd, in effect, stated that she did not send the Trust certain information that she deemed, after discussions with various persons including medical students, detrimental to her claim.

The Court will not tolerate claimant actions that could, in any way, mislead the Trust in the evaluation and processing of claims. Claims falling within this category may include, but are not limited to, claims made by non-existent persons, claims submitted without any evidence of Dalkon Shield use and claims, such as Kidd's, involving wrongful and misleading documentary alterations, additions or deletions. The submission of such claims erodes the integrity of the claims resolution process and impairs the Trust's ability to fully, fairly and expeditiously satisfy all properly submitted and valid Dalkon Shield claims. Negative effects of this nature are detrimental to the class of claimants as a whole and, thus, are completely unacceptable. When the Trust makes a finding that such a claim exists and the claimant is unable to satisfy his or her evidentiary burden, the Court will not disturb a valid decision by the Trust to disallow the claimant's claim.

On this basis, the Court concludes that the Trust did not err in disallowing Kidd's claim. Accordingly, Kidd's claim will not be reinstated.

---

10. The Court is mindful that Kidd is proceeding *pro se* in this matter and that courts must liberally construe the pleadings of *pro se* parties. *See Gordon v. Leeke*, 574 F.2d 1147, 1151–52 (4th Cir.) *cert. denied*, 439 U.S. 970, 99 S.Ct. 464, 58 L.Ed.2d 431 (1978); *Coleman v. Peyton*, 340 F.2d 603, 604 (4th Cir.1965).